# EXHIBIT
# B

# SUBJECT TO BANKRUPTCY COURT APPROVAL

**AMENDED CONTRACT OF SALE**

between

**NUOVO CIAO-DI LLC**

as Seller,

and

**GREENWICH DEVELOPMENT LLC**

as Purchaser.

Premises:  350 6th Avenue, New York, New York

Dated as of August 29, 2023

# TABLE OF CONTENTS

SECTION 1. Recitals Incorporated into Agreement ..................................................................2

SECTION 1A. Purchase and Sale of Premises ......................................................................2

SECTION 2. Purchase Price; Downpayment ........................................................................3

SECTION 3. Closing ..........................................................................................................6

SECTION 4. Title Exceptions .............................................................................................6

SECTION 5. Failure of Seller or Purchaser to Perform ........................................................8

SECTION 6. Representations and Warranties of Seller and Purchaser ...................................8

SECTION 7. Contingencies ............................................................................................. 14

SECTION 8. Violations Affecting the Premises .................................................................17

SECTION 9. Destruction, Damage or Condemnation Affecting the Premises .........................17

SECTION 10. Seller's Closing Obligations ........................................................................19

SECTION 11. Purchaser's Closing Obligations ..................................................................22

SECTION 12. Apportionments and Adjustments; Closing Costs ...........................................23

SECTION 13. Operation of Premises .................................................................................24

SECTION 14. Broker ......................................................................................................25

SECTION 15. Notices .....................................................................................................26

SECTION 16. Limitation on Survival of Representations, Warranties and Obligations .............27

SECTION 17. Prohibition of Recording .............................................................................27

SECTION 18. Miscellaneous ...........................................................................................27

## EXHIBITS

Exhibit A      Premises
Exhibit B      Permitted Exceptions
Exhibit C      Leases
Exhibit D      Lease Defaults and Delinquencies
Exhibit E      Service Contracts
Exhibit F      Form of Deed
Exhibit G      Form of Non-Foreign Status Affidavit
Exhibit H      Form of Assignment and Assumption of Leases
Exhibit I      Form of General Assignment
Exhibit J      Form of Tenant Estoppel

<strong>AMENDED CONTRACT OF SALE</strong>

**AMENDED CONTRACT OF SALE** (the "**Agreement**"), dated as of A u g u s t  2 9 , 2023, (the "Effective Date") between, **NUOVO CIAO-DI LLC**, a Delaware limited liability company, having an address of 1169 Cook Street, Denver, CO, 80206, E-mail: michaelvrainero@gmail.com ("**Seller**"), and **GREENWICH DEVELOPMENT LLC**, a New York limited liability company having an address 220-46 73rd Avenue, Bayside, NY 11364, E-mail: ischwartzlawoffice@gmail.com ("**Purchaser**").

<u>W I T N E S S E T H</u><strong><u>:</u></strong>

**WHEREAS**, Seller is the owner of the following Condominium Units:

- Unit 2FLR (Floor 2- Commercial Unit/ Community Facility) (Block 552, Lot 1302), approximately 8,942 SF, together with a 21.25% undivided interest in the Common Elements (the "**Floor 2 Unit**"); and

- Unit 1FLR (Floor 1- Commercial Unit/ Retail Unit) (Block 552, Lot 1301), approximately 7,856 SF, together with a 19.65% undivided interest in the Common Elements (the "Floor 1 Unit"), which is to be subdivided in accordance of Section 7.2 of this Agreement, to create a Subdivided Unit of approximately 2,853SF (2,353 SF + 500 SF) together with a 7.14% undivided interest in the Common Elements, as depicted on **Exhibit A-1**, together with any easement required by Purchaser, to allow Purchaser direct ingress/ egress to Washington Place (the "**Subdivided Unit**"), and

(Base Lot: Block 552, Lot 5) (with the Floor 2 Unit, the Subdivided Unit to be collectively referred to as the "**Unit**") in the premises known as 88 Washington Place Condominium, (the "**Condominium**"), with "**Building**" defined as the entire structure known as 88 Washington Place Condominium, including all units and appurtenances, and identified by the street number 350 6th Avenue, Borough of Manhattan, City of New York, County of New York, and State of New York, together with the undivided percentage interests in the Common Elements identified above (as such term is defined in the declaration establishing the Condominium dated as of January 26, 2007 and recorded in the Office of the Register of the City of New York on March 9, 2007 in CRFN 2007000128061 (as same has been and may hereafter be amended, the "**Declaration**") and on the tax maps certified by Peter Claman, Registered Architect on January 26, 2007 and filed with the Declaration in the Office of the Register of the City of New York on March 9, 2007 in CRFN 2007000128062 (the "**Tax Maps**") (collectively, the "**Premises**");

**WHEREAS**, the Premises is more particularly described in **Exhibit A** attached hereto and made a part hereof; and

**WHEREAS**, upon the terms and conditions herein set forth, Seller agrees to sell and convey, and Purchaser agrees to purchase, the Property (as hereafter defined in Section 1A, below): and

**WHEREAS**, the Seller acknowledges that the Premises identified above is the subject of a pending mortgage foreclosure proceeding, State of NY Supreme Court, County of New York Index No. 850102-20 (the "Foreclosure"), with Lis Pendens; and

**WHEREAS**, the Premises is also identified as the subject of a foreclosure of Common Charge Liens by the Condominium, ("Lien Foreclosure"), with Lis Pendens; and

**WHEREAS**, the Premises is also identified as the subject of a foreclosure of mechanic's liens proceeding, ("Mechanic's Lien Foreclosure"), with Lis Pendens; and

**WHEREAS**, on January 20, 2023, the Seller filed a voluntary petition pursuant to chapter 11 of Title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), being Case Number 23-10068; and

**WHEREAS**, this Agreement shall be subject to the approval of the Bankruptcy Court; and

**NOW, THEREFORE**, in consideration of the mutual agreements hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**SECTION 1**. The foregoing Recitals are hereby incorporated by reference and made a part of this Agreement.

**SECTION 1A.  Purchase and Sale.**

Upon payment to Seller of the Purchase Price (as hereinafter defined), Seller agrees to sell and convey, and Purchaser agrees to purchase, the Property, as defined above, including

(a)     the estate, right, title and interest, if any, of Seller, reversionary or otherwise, in and to all easements, licenses, privileges and rights of way in or upon the Premises and all other rights, hereditaments and appurtenances belonging or in anywise pertaining to the Premises; and

(b)     all right, title and interest of Seller, if any, in and to the fixtures, systems, machinery, articles of personal property and equipment owned by Seller within the Unit, if any ("**Personal Property**").

(c)     The Premises and all other rights, improvements and property specified above in this Section 1A relating thereto, are referred to hereinafter, collectively, as the "**Property**".

**SECTION 2.  Purchase Price; Downpayment.**

**Section 2.1**

(a)  The aggregate purchase price to be paid by Purchaser to Seller for the Premises (the "**Purchase Price**") is the sum of NINE MILLION and FIFTY THOUSAND and NO/00 ($9,050,000.00)  DOLLARS, which amount shall be payable in accordance with the further provisions of this <u>Section 2, subject to Bankruptcy Court issuance of a Sale Order as defined in Section 7 (e), Bankruptcy Court approval of this sale and Purchaser satisfaction of the Section 7 Contingencies</u>.

(b)  **Purchase and Sale.**

Consistent with Section 7.6, Purchaser shall have 90 days from receipt of the Sale Order, as defined in Section 7(e) in which to Close on the purchase of both the Floor 2 Unit and the Subdivided Unit for the sum of $9,050,000.00, with the Closing contingent upon satisfaction of the Section 7 Contingencies.

i.      Should Purchaser not satisfy the Section 7 Contingencies in the 90  day Contingency Period of Section 7.6, Purchaser may, in its discretion, within 7 business days following expiration of the above 90 day Contingency Period either:

  (i)     Terminate this Agreement, and Escrow Agent shall refund the Escrow Fund (defined below) to Purchaser; or

  (ii)    Request an extension of the Contingency Period from Seller to complete the necessary items to allow Purchaser to Close, which shall be granted by Seller in its reasonable discretion, subject to progress demonstrated by Purchaser toward Closing.

    a.  If the extension is not granted by Seller, Purchaser may terminate this Agreement, and Escrow Agent shall refund the Escrow Fund to Purchaser.

    b.  If the extension is granted (the "Extension Period"), Purchaser may continue to pursue the Closing of this transaction, in accordance with Section 7.6. below.

  i.

2.2     (a)     Purchaser shall pay to Bronson Law Offices P.C. ("**Escrow Agent**"), by wire transfer of immediately available federal funds the amount of FOUR HUNDRED AND FIFTY-TWO  THOUSAND  FIVE HUNDRED and NO/00 ($452,500.00) Dollars as a downpayment (the "**Downpayment**") on account of the Purchase Price, which shall be due and payable by Purchaser to the Escrow Agent, upon entry of the order of the Bankruptcy Court approving this sale, the "Sale Order", as defined in Section 7(e), below. This Downpayment, and all other or further downpayments made hereunder, together with all interest earned thereon (collectively, the "**Escrow Fund**") shall be held in escrow in the Attorney IOLA Trust Account of Bronson Law Offices P.C. by Escrow Agent pursuant to Section 2.3 hereof.

(b)     Unless this Agreement is earlier "Terminated" by Purchaser, See Section 2.3 {b} below, at the "Closing" (as hereinafter defined), Purchaser shall pay to Seller the Purchase Price less the Escrow Fund with interest, which is a credit against the Purchase Price for Purchaser at Closing, subject to apportionments and other adjustments made in accordance with the terms of <u>Section 12</u> hereof, by wire transfer of good funds in accordance with <u>Section 2.2{b}</u>, hereof. Except as otherwise provided for in this Agreement, all monies payable to Seller, Escrow Agent or Purchaser pursuant to this Agreement, shall be paid by wire transfer in immediately available federal funds to an account or accounts designated in writing from time to time by Seller, Escrow Agent or Purchaser, respectively.

(c)     In the event that Purchaser does not Close on the subject Premises in compliance with either Section 2.1(b) or unless previously terminated by Purchaser, Seller may send a Notice of Default to Purchaser. Unless Purchaser sends a Notice of Termination within ten (10) days of receipt of the Notice of Default, the Escrow Fund will be forfeited to Seller. In all other cases, the Escrow Fund shall be returned to Purchaser.

2.3. (a)   <u>Requirements Associated with the Escrow Agent and the Escrow Fund</u>. Escrow Agent shall hold the Escrow Fund, for the exclusive benefit of the Purchaser. It is understood and agreed by the parties to this Agreement that under no circumstance shall the Escrow Fund be deemed "property of the bankruptcy estate" with the parties and the counsel to the Seller to ensure that the Sale Order, see Section 7(e), contains such provisions as are necessary to ensure that the Escrow Fund remains the property of Purchaser, and shall not be designated as "property of the estate". Purchaser has made this Downpayment to the Escrow Agent, defined as the Escrow Fund, as a showing of good faith to Seller. It is fundamental to Purchaser's willingness to provide this Downpayment thereby funding the Escrow Fund, that upon demand by Purchaser, following Termination of this Agreement by Purchaser, which shall be in accord with Purchaser's rights to Terminate in this Agreement, including that such Termination in accordance with, the Section 7 Contingencies, the Escrow Agent shall immediately release the Escrow Fund from Escrow, and shall immediately return the Escrow Fund to Purchaser. The Escrow Fund shall at all times be the monies of the Purchaser and held by the Escrow Agent exclusively for the benefit of the Purchaser. The Escrow Fund shall be held in a non-interest bearing IOLA account at JP Morgan Chase Bank, N.A. (or as otherwise agreed in writing by Purchaser in a New York Clearing House Bank (the "<u>Escrow Account</u>").

The Escrow Fund shall be held by the Escrow Agent to until earlier of the Termination of this Agreement by either party, or the Closing of this transaction. Escrow Agent shall hold these funds in trust in absolute compliance with the provisions of this Section 2.3, including:

(i)     Interest accrued on the Escrow Fund, if any, shall be paid to the party receiving the Escrow Fund.

(ii)    Except as a result of Escrow Agent's gross negligence or misconduct, Escrow Agent shall not be liable for any loss or damages incurred to Purchaser or Seller

**(b)** Termination of this Agreement ("Termination").
In the event of Termination of this Agreement, written notice shall be provided in accordance with Section 15, below.

**(i)** <u>Termination by Purchaser</u>. Purchaser may elect to Terminate this Agreement if the Section 7 Contingencies are not satisfied to the standard of Section 7(f), as well as pursuant to the provisions of Section 2.1(b).

**(ii)** <u>Termination by Seller</u>. In the event that Purchaser does not Close on the subject Premises in accordance with Section 2.1(b) or terminate pursuant to Section 2.1(b), unless previously terminated by Purchaser, Seller may elect by Notice of Termination sent to Purchaser, to Terminate this Agreement.

> a. Consistent with the provisions of Section 2.1(b) Seller shall have no right to declare Purchaser to be in Default nor to Terminate this Agreement during the 90 day Contingency Period, nor an extension thereof. This is to allow Purchaser the time to satisfy Article 7 Contingencies and Close.

**(iii)** Upon receipt of any Notice of Termination provided to the Escrow Agent which is consistent with the provisions of Section 2.3(b)(i) and Section 2.3(b)(ii) above, Escrow Agent shall return the Escrow Fund to the party issuing the Notice of Termination. However, the Escrow Agent will have no liability for continuing to hold the Escrow Fund pending a Court Order or agreement of the parties hereto. After such Termination, neither Purchaser nor Seller to have any rights, nor further obligations to the other.

**(c)** <u>Seller Acknowledgment of Escrow Agent and Requirements Associated with the Escrow Fund</u>. The Seller acknowledges and agrees the Escrow Fund is at all times the sole property of the Purchaser, unless and until the Escrow Fund is forfeited to Seller; *provided, however*, that the Seller hereto acknowledges and agrees that the Seller, by its execution and delivery of this Agreement, agrees that but/ for the assurances present in this Section 2.3, and elsewhere in this Agreement, Purchaser would not have been willing to enter into this Agreement, nor would Purchaser have been willing to allow its monies to be deposited into the Escrow Fund. Seller and Purchaser shall jointly and severally indemnify, defend and hold harmless (collectively, the "<u>Indemnity</u>") the Escrow Agent from and against any and all losses, costs, liabilities, claims, damages or expenses (including, without limitation, reasonable attorney's fees and costs) (collectively, "<u>Losses</u>") which may be incurred or suffered by Escrow Agent in connection with the Escrow Agent's performance of its duties as Escrow Agent. The provisions of this <u>Section 2.3(c)</u> shall survive the Closing, or if the Closing does not occur, the termination of this Agreement, for a period of six (6) months.

## SECTION 3. <u>Closing</u>.

The closing of the transaction contemplated by this Agreement (the "**<u>Closing</u>**") shall occur on a date selected by Purchaser on at least ten (10) business days' notice, but in any event on or before the fifteenth (20th ) business day following the satisfaction of the "**<u>Contingencies</u>**", as defined below at Section 7, (or if such 20th day is not a business day, the next business day). The Closing shall occur remotely by way of an escrow with the "Title Insurer" (as hereinafter defined) or at such other time or place as shall be agreed by the parties. The date on which the Closing shall

actually occur is referred to herein as the "**Closing Date**".

**SECTION 4.  Title Exceptions.**

4.1.    At the Closing, provided that neither Purchaser nor Seller has terminated this Agreement pursuant to the terms hereof, Seller shall transfer marketable title to the Premises to Purchaser pursuant to the "**Transfer Documents**" (as hereinafter defined), subject only to the following (collectively, the "**Permitted Exceptions**"):  (a) the matters set forth on <u>Exhibit B, Permitted Exceptions,</u> annexed hereto and made a part hereof; and (b) all "Violations" (as hereinafter defined), if any, which are against the Building and not specifically against the Unit and do not adversely affect the use and enjoyment of the Unit for Purchaser's intended purposes.

4.2.    (a) Purchaser has obtained a title report (the "**Title Report**") with respect to the Premises prepared by Landmark Abstract Agency LLC (the "**Title Insurer**") dated September 14, 2022, which shall be updated at the time of execution of this Agreement, and subject to continuation thereafter.  Purchaser shall instruct the Title Insurer to deliver to Seller's counsel the Title Commitment, all Title Updates and all other related documents (including copies of all title exception documents), simultaneously with the delivery thereof to Purchaser, at Purchaser's sole cost and expense. By execution of this Agreement, Purchaser acknowledges its approval of all Permitted Exceptions to title set forth on <u>Exhibit B</u> attached hereto.  At or prior to Closing, Purchaser shall order a new title report or a continuation of the Title Report (the "<u>Continuation</u>"), which shall be promptly forwarded to Seller upon receipt from the Title Company or shall be sent directly from the Title Company.  Any objections to title which are contained in the Title Report or the Continuation and which are not contained on Exhibit B shall be Title Defects which must be cured by Seller, and whose cure is a condition to Closing.

(b) Within ten (10) business days of receipt of the Title Report and; Seller shall provide documentation to Purchaser confirming that the Premises shall be released from the present Bankruptcy proceeding and the Foreclosure proceedings, with all Lis Pendens to be terminated as to this Premises, and the Premises released from the present mortgage, as well as termination of the Lien Foreclosure and Lis Pendens, with any related or associated defects in title to be cured.

(c)  Notwithstanding anything to the contrary, the Title Company shall use best efforts recognize that the Bankruptcy Court order delivers free and clear title to the Property to the Purchaser terminating the Lis Pendens and Lien Foreclosure action, with in such case, the Bankruptcy Court to deliver marketable title to Purchaser.

4.3.    For the avoidance of doubt, Seller, at Seller's sole cost and expense, shall be required to cure, remove or to cause to be removed of record at or prior to the Closing, without limitation as to amount, the following (collectively, "**Mandatory Cure Items**"): (a) the lien of any mortgage which encumbers the Premises as of the date of the Closing (provided however, subject further to the provisions on the assignment of such mortgage to the Purchaser's lender, if any); (ii) any liens which Seller places or is placed on the Premises, including mechanics liens, judgments and federal tax liens; (iii) any fines, penalties and interest or other liens or encumbrances against the Premises or adverse conditions or conditions of non-compliance, (iv)

9

securing a release of the Premises from the present Foreclosure, (v) securing a termination of the Lis Pendens filed against the Premises (vi) securing a release of the Premises from the present mortgage lien, (vii) termination of the Lien Foreclosure and Lis Pendens, (viii) releasing the Premises from the Bankruptcy proceeding, and (ix) addressing any other matter which impairs the marketability of title to the Premises. Alternatively, Seller may provide a Bankruptcy Court order delivering the Property free and clear, marketable title to Purchaser.

4.4.　　With respect to any Title Defects, Seller shall deliver to the Title Insurer such affidavits and certificates as may be determined by the Title Insurer as being sufficient to induce the Title Insurer to, and provided the Title Insurer does, omit such defect or exception from Purchaser's Title Policy. To enable marketable title to be conveyed, Seller shall have an obligation to expend funds or otherwise cure all Title Defects. Seller shall have the right to cause any mortgage, lien or other encumbrance on the Premises to be satisfied, or assigned, as may be required by Purchaser, at the Closing out of the Purchase Price, and to cause payment of any transfer tax or other amounts payable by Seller, by directing Purchaser to remit the Purchase Price in one or more wire transfers or certified checks or payments to such persons or entities as Seller may direct. Seller shall be entitled to one or more reasonable extensions of the Closing Date, not to exceed sixty (60) days in the aggregate, to cure any Title Defect. Purchaser shall determine if title to be conveyed is acceptable and may elect to Terminate this Agreement. Alternatively the Seller may provide a Bankruptcy Court order that cures the Title Defects, and delivers marketable title to Purchaser.

## SECTION 5.  Failure of Seller to Perform.

5.1.　　(a)　　If Seller shall be unable to convey title to the Premises to Purchaser in accordance with this Agreement (subject to the provisions of Section 4 above), then, in such event, Purchaser shall be entitled (i) to accept such title as Seller is able to convey, without any credit, reduction, adjustment or abatement in, to or of the Purchase Price, or Purchaser and Seller may reach agreement as to the terms under which Purchaser is willing to accept title, (ii) to Terminate this Agreement, either prior to the Closing or at the Closing (as the same may be adjourned by Seller pursuant hereto), as determined by Purchaser, in which case Escrow Agent shall immediately refund the Escrow Fund to Purchaser in accordance with Section 2.3 hereof, (iii) to bring a motion or proceeding before the Bankruptcy Court seeking specific performance of the terms of this Agreement for conveyance of the Premises in accordance with the terms of this Agreement, or bring an action for money damages, at the election of Purchaser, within thirty (30) days of the Closing Date. If Seller shall be unable to obtain entry of the Sale Order on or before 60 days from the full execution of this Agreement., Purchaser may, in its sole discretion at any time thereafter, Terminate this Agreement by providing written notice of such termination to Seller. If Purchaser shall elect to Terminate this Agreement pursuant to this Section 5.1(a), then, in such event, upon Purchaser's receipt of the Escrow Fund from the Escrow Agent, this Agreement shall Terminate automatically and be of no further force or effect and neither party hereto shall have any further rights or obligations hereunder or thereunder without the necessity for any further notice, instrument, document or action by or between any of the parties; *provided, however*, that the terms and provisions of, and indemnities contained in, Section 14 hereof shall survive any such Termination, together with all other indemnities, representations, warranties and

obligations which are specifically provided herein to survive any such termination

**SECTION 6.** <u>**Representations and Warranties of Seller and Purchaser.**</u>

6.1. Seller hereby represents and warrants to Purchaser as follows as of the date hereof and as of the Closing Date:

(a) Seller is a valid and existing limited liability company under the laws of the State of New York.

(b) Seller is duly authorized, upon the signature of the individual(s) executing this Agreement on behalf of Seller, to be bound by its obligations hereunder. Seller hereby represents and warrants that Michael Rainero is the managing member of Seller, and is duly authorized by the Seller, and its members, to enter into this Agreement, by providing a duly executed Resolution of Seller evidencing this authority to act, at any time, upon request of Purchaser. Seller shall cooperate with Purchaser, as may be required, to fulfill the Contingencies, and to perform all actions required to consummate this transaction and Close.

(c) The execution, delivery and performance of this Agreement, and all other agreements, documents and instruments to be executed by Seller pursuant to this Agreement, when duly executed and delivered by Seller, will each constitute the binding obligation of Seller, enforceable in accordance with its terms and such execution and consummation of the transactions contemplated hereby do not breach or violate any organizational documents of Seller.

(d) Aside from consent of the Bankruptcy Court, no approval, authorization, order, license or consent of, or registration or filing with, any governmental authority or regulatory body is required in connection with the execution and delivery by Seller of this Agreement or the consummation by Seller of the transactions contemplated hereby. The present use of the Premises complies with the Certificate of Occupancy.

(e) Excepting the present case in Bankruptcy Court, and the pending Foreclosure, there is no litigation, suit, arbitration, claim or proceeding pending or, to Seller's knowledge, threatened in writing against Seller in any court or before any governmental agency or instrumentality that, if determined adversely to Seller, would materially and adversely affect the Premises, the enforceability of this Agreement or any other document or instrument executed or to be executed in connection herewith or the ability of Seller to perform its obligations hereunder or to consummate the transactions contemplated hereby or would otherwise be binding upon the Premises and/or Purchaser.

(f) Seller shall secure the consent of the Bankruptcy Court to this Agreement, as well as the approval of the Bankruptcy Court to the conveyance of this Property, in accordance with this Agreement at Closing, the release of the Premises from the Foreclosure, a release from the present mortgage lien, and shall cause the subject Lis Pendens to be extinguished as against the Premises, as well as termination of the Lien Foreclosure and Lis Pendens.

(g) There are no leases, tenancies, rental agreements, occupancy rights or possessory rights of any kind affecting any portion of the Premises as of the date hereof.

(h)     Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code, as amended.

(i)     The only service, maintenance, supply and management contracts (collectively, "**Service Contracts**") presently in effect with respect to the Premises, if any, are set forth in Exhibit E annexed hereto, and Seller shall not enter into, extend, amend, modify or renew any of the Service Contracts, without the prior written consent of Purchaser,; *provided*, *however*, that no consent shall be required for a Service Contract (or an amendment or extension thereof) that is terminable on or before Closing without penalty.

(j) There are no employees who work at the Premises for Seller.  The Premises are not subject to any union collective bargaining agreement or similar contract or agreement.

(k)     Intentionally omitted.

(l)     There are no rights of first refusal, rights of first offer or options to purchase the Premises or any interest therein nor any interest in the Seller.

(m)     Seller has filed, or will prior to Closing file, the New York City Department of Finance Real Property Income and Expense Form (Form RPIE) for calendar year [2021]. All RPIE filings for the Premises have been made when due. There are no anticipated, apparent or foreseeable penalties against the Premises for Seller's failure comply with any NYC Department of Finance requirements, or other regulatory requirements.

(n)     There are no: (i) pending, threatened or contemplated annexation or condemnation proceedings, or private purchase in lieu thereof, affecting or which may affect the Premises, or any part thereof, (ii) proposed or pending proceeding to change or redefine the zoning classification of all or any part of the Premises, (iii) proposed or pending special assessments affecting the Premises or any portion thereof, or (iv) proposed change(s) in any road patterns or grades or curb cuts with respect to the roads providing a means of ingress and egress to the Premises.

(o)     Seller has: (i) commenced a voluntary case for relief under chapter 11 of the Bankruptcy Code; and/ or (ii) a receiver has been appointed in the pending foreclosure action to hold, administer and/or liquidate all or substantially all of its property.

(p)     Neither Seller nor any Person who owns an interest in Seller (collectively, a "Seller Party") is now nor at any time prior to or at the Closing will be, a Person with whom a U.S. Person, including, without limitation, a Financial Institution, is prohibited from transacting business of the type contemplated by this Agreement, whether such prohibition arises under United States law, regulation, executive orders or lists published by OFAC (including those executive orders and lists published by OFAC with respect to Persons that have been designated by executive order or by the sanction regulations of OFAC as Persons with whom U.S. Persons may not transact business or must limit their interactions to types approved by OFAC) or otherwise.

(q)     Neither Seller nor any Seller Party: (i) to Seller's knowledge, is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist-related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti Money Laundering Laws; (ii) to Seller's knowledge, has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) to Seller's knowledge, has had any of its funds seized or forfeited in any action under any Anti Money Laundering Laws.

(r)     To Seller's knowledge, Seller has not violated any applicable provision of the Patriot Act.

(s)     For a period of one (1) year after the Closing Date, Seller agrees to cooperate with Purchaser, and to cause each Seller Party to cooperate with Purchaser, in providing such additional information and documentation on Seller's and each Seller Party's legal or beneficial ownership, policies, procedures (to the extent required by applicable laws) and sources of funds as Purchaser deems reasonably necessary or prudent to enable Purchaser to comply with Anti-Money Laundering Laws now in existence or hereafter enacted or amended.

(t)     Excepting those identified in the Title Report referenced in Section 4.2, above, with such Title Report to be updated and continued ongoing until the Closing or earlier termination of this Agreement, there are no mechanic's liens on the Property as the result of any contract, agreement or work performed on the Property pursuant to an agreement with Seller or on behalf of or at the request of Seller.

(u)     There are no tax certiorari proceedings currently ongoing for the Property.

(v)     To Seller's knowledge, Seller has not received written notice of the existence of any, and to its knowledge there are no, charges, assessments or liens for public improvements concerning the Property which remain unpaid.

(w)     To Seller's knowledge, Seller has not received any written notice, citation or other claim from the United States Environmental Protection Agency or any other governmental authority seeking any information or alleging any violation of any laws, ordinances, statutes, rules, regulations, covenants, conditions, restrictions or requirements relating to Seller, the Property nor the Building.

(x)     To Seller's knowledge, no Hazardous Substances are present in the Unit in violation of applicable Environmental Laws.  For purposes of this Agreement:

        (i)     the term "Hazardous Substances" shall mean any substance, gas material or chemical which is currently defined as "hazardous substances", "toxic substances", "hazardous materials" or "hazardous wastes" under any Environmental Law; and

        (ii)     the term "Environmental Laws" means all applicable present and future statutes, regulations and rules of any governmental agencies,

departments, commissions, boards bureaus or instrumentalities of the United States, the State of New York and the City of New York in respect of the protection of human health or the environment.

To Seller's knowledge, Seller is not aware of any reports relating to the presence of any Hazardous Substances (hereinafter defined) in, on or under the Property or the Building, or the transport, storage, use or disposal of Hazardous Substances in, at or from the Property or the Building. Seller is not aware of the presence of any underground storage tanks at the Property.

(y)     As of the Effective Date, monthly Common Charges (as defined in the Condominium Documents) assessed against the Unit are $__, which shall be provided by Seller.

(z)     As of the Effective Date, Seller is not aware of any pending or contemplated assessment by the Condominium against the Unit or unit owners generally.

(aa)     As of the Effective Date, to Seller's knowledge, Seller has received no challenges to its title to the Property.

(bb)     To Seller's knowledge, there are no mortgages encumbering the Unit other than the mortgages identified in the Title Report.

Seller's representations and warranties contained herein shall be true and correct on the date hereof and remain true and correct through and including the Closing Date, with the change or update to any Seller representations between now and Closing to be immediately provided in writing to Purchaser.

6.2.    Except as set forth in Section 6.1 hereof, Seller makes no representation, warranty or covenant of any kind with respect to: the Premises; any environmental conditions at, or with respect to, the Premises; the compliance or non-compliance of the Premises or any portion thereof with the provisions of any applicable local, municipal, state or federal statute, law, ordinance, rule or regulation (including administrative rules and regulations), including, without limitation, the zoning regulations or other governmental requirements applicable to, or with respect to, the Premises or the Americans With Disabilities Act ("**ADA**"); the site or physical conditions applicable to, or with respect to, the Premises; or any other matters whatsoever affecting the title, use, enjoyment, occupancy, operation, management, leasing, or condition to, of or with respect to the Premises or any part thereof. Seller's representations set forth in Sections 6.1 and 6.2 shall survive the Closing for a period of six (6) months.

6.3.    Purchaser hereby represents and warrants to Seller as follows:

(a)     Purchaser is a valid and existing limited liability company under the laws of the State of New York.

(b)     Purchaser is duly authorized, upon the signature of the individual(s) executing this Agreement on behalf of Purchaser, to be bound by its obligations hereunder.

(c)     The execution, delivery and performance of this Agreement, and all other agreements, documents and instruments to be executed by Purchaser pursuant to this Agreement, when duly executed and delivered by Purchaser and approved by the Bankruptcy Court, will each constitute the binding obligation of Purchaser, subject to the provisions of this Agreement, and such execution and consummation of the transactions contemplated hereby do not contravene the certificate of incorporation, by-laws or operating or partnership agreement of Purchaser or breach or violate any organizational documents of Purchaser.  Purchaser's representations set forth in Sections 6.3(a)-(c) shall survive the Closing for a period of six (6) months.

(d)     Purchaser has inspected the Premises and reviewed all agreements pertaining to the Premises and, as a result of such inspection and review, is fully familiar with the Premises, including, without limitation, their present physical and financial condition and present state of repair.  At the Closing, Purchaser shall accept the Premises **"AS IS", "WHERE IS" and "WITH ALL FAULTS"** (whether latent, patent or detectable or not) on the date hereof and, subject to reasonable wear and tear and the terms of this Agreement, on the Closing Date.  Purchaser acknowledges and agrees that, except as specifically provided in this Agreement except as explicitly set forth herein, (i) neither Seller nor any of its direct or indirect principals, members, joint venturers, partners or affiliates, nor its or their employees, agents, brokers and representatives (collectively, "**Seller and its Representatives**") nor any other person, has made any representation, warranty, promise or covenant, express or implied, with respect to the Premises, the fitness, merchantability, suitability or adequacy of the Premises for any particular purpose, any environmental condition at or with respect to the Premises, the compliance or non- compliance of the Premises or any portion thereof under the provisions of any applicable local, municipal, State or Federal statute, law, ordinance, rule or regulation, including, without limitation, the ADA, the site or physical conditions applicable to or with respect to the Premises, the zoning regulations or other governmental requirements applicable to or with respect to the Premises or any other matters whatsoever affecting the title, use, enjoyment, occupancy, operation, management, leasing, ownership, sale or condition to, of or with respect to the Premises or any part thereof, and (ii) neither Seller and its Representatives nor any other person will have, or be subject to, any liability to Purchaser or any other person resulting from the distribution to Purchaser, or Purchaser's use of, any information pertaining to the Premises which is not specifically set forth in this Agreement.  Without limiting the generality of the foregoing, Purchaser further acknowledges and agrees that (A) no representation, warranty, covenant or indemnity has been made or will be given to Purchaser or any other person in  respect of any environmental liability with respect to any dangerous, toxic or hazardous wastes, materials, pollutants or substances ("**Hazardous Materials**"), as such terms are defined in federal, state and local environmental laws and regulations, including, without limitation, the United States Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended (collectively, "**Environmental Laws**"), and (B) in no event whatsoever shall Seller and its Representatives have any liability to Purchaser, or otherwise, with respect to Hazardous Materials affecting the Premises or Environmental Laws. Purchaser also represents that Purchaser has had sufficient opportunity to conduct such investigations of and with respect to the Premises as it has deemed necessary and advisable.  Purchaser's representations, warranties, acknowledgments and agreements set forth in this Section 6.3(d) shall survive the Closing for a period of six (6) months.

(e)     Excepting as set forth in Section 7, Contingencies, below, no approval,

authorization, order, license or consent of, or registration or filing with, any governmental authority or regulatory body is required in connection with the execution and delivery by Purchaser of this Agreement or the consummation by Purchaser of the transactions contemplated hereby.

(f)     There is no litigation, claim or proceeding pending or, to Purchaser's knowledge, threatened in writing against Purchaser in any court or before any governmental agency or instrumentality that, if determined adversely to Purchaser, would materially and adversely affect the enforceability of this Agreement or any other document or instrument executed or to be executed in connection herewith or the ability of Purchaser to perform its obligations hereunder or to consummate the transactions contemplated hereby.

(g)     Purchaser is solvent and has not filed, nor has there been filed against it, nor do grounds exist for the filing of, any voluntary or involuntary petition in bankruptcy or insolvency and no receiver or trustee or similar custodian has been appointed with respect to its property or any material portion thereof.  The funds comprising the Purchase Price to be delivered to Seller in accordance with this Agreement are not derived from any illegal activity. Purchaser's representations set forth in this Section 6.3(g) shall survive the Closing.

(h)     Intentionally omitted.

(i)     Except as specifically set forth in this Agreement, Purchaser has not been induced by, and has not relied upon, any representation, warranty, promise or statement made by Seller and its Representatives.  Purchaser's representations set forth in this Section 6.3(i) shall survive the Closing, or earlier termination, of this Agreement, for a period of six (6) months.

(j)     Purchaser is not a, and is not acting directly or indirectly for or on behalf of any, person, group, entity or nation named by Executive Order of the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Person," or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control and Purchaser is not engaged in this transaction, directly or indirectly, on behalf of, or instigating or facilitating this transaction, directly or indirectly, on behalf of any such person, group, entity or nation. Purchaser's representations set forth in this Section 6.3(j) shall survive the Closing, or earlier termination, of this Agreement, for a period of six (6) months.

6.4     Purchaser's representations and warranties contained herein shall be true and correct on the date hereof and remain true and correct through and including the Closing Date, with the change or update to any Purchaser representations between now and Closing to be immediately provided in writing to Seller.

# SECTION 7. Contingencies.

The Closing of this transaction is expressly contingent upon the successful completion and fulfillment of each of the following contingencies enumerated in this Section 7 (collectively, the "Contingencies").

a) Costs/ Expenses. Purchaser and its professionals shall direct the necessary efforts to satisfy

the Contingencies with the full cooperation and assistance of Seller, with all associated costs and expenses to be the sole responsibility of Purchaser; and

b) <u>Purchaser in the Name of Seller</u>. "Purchaser in the name of Seller" shall mean that Purchaser shall have writings and documents prepared, including without limitation, applications, submissions, forms or consents (the "Writings"), to pursue satisfaction of the Contingencies to allow this transaction to potentially be concluded. Such Writings shall then be provided to Seller for execution, or such other actions as may be required by Seller to complete to support satisfying the Contingencies; and

c) <u>Seller Cooperation</u>. Seller shall at all times fully cooperate with Purchaser, in all matters, including promptly executing any document or writing requested by the Purchaser, as well as in connection with the NYS Attorney General Department of Law (the "AG") approvals, the Unit Subdivision, and all other matters necessary to fulfill the Contingencies. Should Seller refuse, fail to perform such actions, such as execution of Writings, as are requested by Purchaser, Purchaser may immediately terminate this Agreement; and

d) <u>Access to Premises</u>. Seller shall at all times allow such access to the Premises as is necessary and appropriate, in the opinion of Purchaser, to fulfill the Contingencies; and

e) <u>Sale Order</u>. Entry of an order of the Bankruptcy Court, by not later than 60 days from the full execution of this Agreement, with such Sale Order in form and substance acceptable to Purchaser, in its sole discretion, and approving this Agreement in its entirety (the "Sale Order").

f) <u>Standard of Purchaser Satisfaction of the Contingencies and throughout this Agreement</u>. The applicable standard to be applied to Purchaser satisfaction of the Contingencies or Purchaser satisfaction otherwise with provisions of this Agreement, shall at all times be to the personal satisfaction of Purchaser.

g) <u>Termination by Purchaser</u>. Should Purchaser at any time determine, in its discretion, as provided in Section 7(f), for example, that adequate progress toward satisfaction of the Contingences is not being made, the subject transaction lacks economic feasibility due to costs incurred, delay or market conditions, Purchaser may provide written notice of Termination to Seller, with such notice of Termination to be deemed effective at the time notice of Termination is given, with the Escrow Agent to immediately refund the entirety of the Escrow Fund to Purchaser pursuant to Section 2.3.

7.1     <u>AG No-Action Letter</u>. Purchaser, in the name of Seller, shall have obtained a No-Action Letter (the "No-Action Letter") from the AG with respect to the conveyance of the Premises to Purchaser and the subdivision of the Floor 1 Unit pursuant to Section 7.2 below. The form of the application for a No-Action Letter is annexed hereto as **<u>Exhibit A-2</u>**. [Purchaser will provide draft exhibit.] Purchaser shall promptly apply to the AG for such No-Action Letter and shall diligently pursue obtaining the same.

7.2     <u>Unit Subdivision and Reconfiguration</u>. Purchaser, in the name of Seller, shall have subdivided the Floor 1 Unit creating the Subdivided Unit, which process shall consist of the following steps:

(a) Receipt of the No-Action Letter from the AG permitting the subdivision and sale, as described in Section 7.1 above.

(b) Recording in the Office of the Register of the City of New York an amendment to the

17

Condominium Declaration and an amendment to the Tax Maps to create the Subdivided Unit. The amendment to the Condominium Declaration and amendment to the Tax Maps shall be drafted by Purchaser's professionals and the amendment to Condominium Declaration shall be executed by Seller as the owner of the Units. Seller shall give reasonable access to the Units to the architects, engineers and other construction professionals Purchaser may retain.

(c) All necessary approvals of the Condominium Board of Managers, Condominium Association or other jurisdictional entities or individuals, necessary to consent, or approve the subdivision or resultant reconfiguration of this Subdivided Unit with Floor 2 Commercial Unit: Block 552, Lot 1302.

7.3    <u>Certificate of Occupancy Secured</u>. Certificate of Occupancy in place for the Subdivided Unit and the reconfigured Floor 2 Unit.

7.4    <u>Approvals Secured for Child Care Facility</u>. Purchaser shall have secured all necessary approvals, licenses and registration such license from the State of New York and any other jurisdictional authority to allow Purchaser to operate the Premises as a Childcare facility, with Purchaser to be granted such easement(s) for ingress and egress to the Unit, as may be required by the jurisdictional authority to allow Purchaser's intended use of the Unit and Premises.

7.5    <u>Marketable Title</u>. Marketable Title to the Unit shall be conveyed at Closing, with Marketable Title to be in the opinion of Purchaser's Title Insurer, and shall require the following, including without limitation: free and clear of all liens, judgments, Notices of Pendency, litigations, proceedings, violations and claims.

7.6  <u>Timeframe to Satisfy the Contingencies</u>. All Purchaser deadlines shall run from Purchaser receipt of the Sale Order, as defined in Section 7(e), above. Therefore, Purchaser shall have a period of ninety (90) days from its receipt of the Sale Order in which to satisfy the Contingencies (the "Contingency Period") The Contingency Period shall be subject to extension by Purchaser request to Seller to allow Purchaser to complete the necessary items to allow it to Close, with such extension to be granted by Seller in its reasonable discretion subject to substantial progress demonstrated by Purchaser toward satisfaction of the Contingencies and Closing. "Substantial Progress" shall be defined as Purchaser's good faith and ongoing efforts toward satisfaction of the Contingencies, considering the difficulty associated with accomplishing such tasks.Should Seller fail to grant the extension requested, Purchaser may terminate this Agreement and Escrow Agent shall refund the Escrow Fund to Purchaser. Should Seller agree to the Extension Period, Purchaser will work to satisfy the remaining Section 7 Contingencies to allow it to Close. At the conclusion of any Extension Period, Purchaser may elect to terminate this Agreement with Escrow Agent to return the Escrow Fund to Purchaser, or Purchaser may elect to request a further Extension Period from Seller, which if granted Purchaser may continue its efforts to Close, and if the Extension Period is not granted, Purchaser may terminate this Agreement, with the Escrow Fund to be returned to Purchaser by Escrow Agent.  As set forth above, Seller shall have no right to Terminate this Agreement nor delare a default during the Contingency Period nor during any Extension Period.

Notwithstanding the foregoing, any Contingency Period or Extension Period shall be subject to extension for any period of delay caused by Seller or any third parties, and their actions, including without limitation: Seller failure to cooperate and assist with the requirements of Section 7(a), (b), (c), (d) and (e), the application by any person/ entity to any court or jurisdictional authority, delay caused by any court proceedings, administrative action, or an act of any lender or other person or entity serving to delay Purchaser's efforts to satisfy the Contingencies.

7.7    Failure to Satisfy Contingencies. Consistent with Section 2.3, should the Contingencies not be satisfied to Purchaser's personal satisfaction (Section 7(f)), in the allowed timeframe, see Section 7.6, above), Purchaser may, in its discretion, provide written notice to Seller, Terminating this Agreement, with such notice of Termination to be deemed effective at the time such notice of Termination is given, with the Escrow Agent to immediately refund the entirety of the Escrow Fund to Purchaser pursuant to Section 2.3.

## SECTION 8.  Violations Affecting the Premises.

Seller shall convey title to the Premises to Purchaser free and clear of all violations of law or governmental ordinances, orders or requirements by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises (collectively, "**Violations**").

## SECTION 9.  Destruction, Damage or Condemnation Affecting the Premises.

9.1    Seller agrees (a) to maintain its present property insurance policy including fire and extended coverage and (b) to give Purchaser reasonably prompt notice, within two (2) business days, of any fire or other casualty occurring at the Premises of which Seller obtains knowledge, between the date hereof and the date of the Closing, or of any actual or threatened condemnation of all or any part of the Premises of which Seller obtains knowledge.

9.2    (a)    Seller and Purchaser waive the provisions of all applicable laws (including General Obligations Law Section 5-1311) relating to the occurrence of a casualty between the date hereof and the Closing, and Seller and Purchaser agree that the following provisions with respect thereto shall govern. Seller agrees to notify Purchaser promptly, within two (2) business days, if the Premises shall be destroyed or damaged in whole or in part by fire or other casualty prior to the Closing.

(b)    If prior to the Closing, the Premises are damaged or destroyed by fire or other casualty to a "material extent", Purchaser may, in its discretion, (i) Terminate this Agreement and demand that Escrow Agent refund the Escrow Fund, with interest, to Purchaser in accordance with Section 2.3 hereof, or (ii) close title to the Premises and, at the Closing, receive an assignment, without representation, warranty or recourse of any kind, of all of Seller's right, title and interest in and to any insurance proceeds arising by reason of such casualty and payment by Seller to Purchaser of any deductible relating to such casualty. If Purchaser shall elect to Terminate this Agreement pursuant to clause (i) of this Section 9.2(b), then, in such event, the Escrow Fund with interest shall be promptly returned to the Purchaser, and thereafter, this Agreement shall Terminate automatically and be of no further force or effect and neither party hereto shall have any further rights or obligations hereunder or thereunder without the necessity for any further notice,

instrument, document or action by or between any of the parties; *provided, however*, that the terms and provisions of, and indemnities contained 5-in, <u>Section 14</u> hereof shall survive any such termination, together with all other indemnities, representations, warranties and obligations which are specifically provided herein to survive any such termination. Unless otherwise provided herein, the term "material extent" shall mean damage or destruction, the cost of repairing which exceeds Two Hundred Fifty Thousand and 00/100 ($250,000.00) Dollars, as determined in the reasonable judgment of Purchaser. If, prior to the Closing, the Premises is damaged or destroyed by fire or other casualty to less than a "material extent," and the Condominium decides to rebuild, Purchaser shall have the right, in its discretion, to Terminate this Agreement by reason thereof, otherwise this Agreement shall remain in full force and effect notwithstanding such casualty, Purchaser shall purchase the Premises with the Premises in its then condition with an agreed to reduction of the Purchase Price or adjustment and Seller shall assign to Purchaser, without representation, warranty or recourse of any kind, all of Seller's rights in and to any insurance proceeds arising thereby and shall pay to Purchaser an amount equal to any deductible relating to such casualty. Seller shall take all steps necessary or appropriate to facilitate the assignment of such claims or, if Seller receives such proceeds, such proceeds will be promptly given to Purchaser. In the event that such fire or casualty can be repaired and restored prior to Closing, then at Purchaser election, it may receive the insurance proceeds and any adjustment in price as may be agreed with Seller, plus an amount equal to the deductible, or, as determined by Purchaser, Seller shall take such steps to undertake such repairs and restoration and may use the insurance proceeds to which it is entitled for that purpose. Any surplus of insurance proceeds not credited against the Purchase Price or used for restoration, shall be disbursed to Purchaser. In the event that the Condominium determines to not rebuild and restore the Building, then Purchaser may either (y) proceed with its obligations under this Agreement in which case, at Purchaser's sole discretion, Seller shall proceed with its obligations under this Agreement and Seller shall disburse to Purchaser any proceeds from the sale of the Building (the "Proceeds") or credit such amounts against the Purchase Price at the Closing or, if such Proceeds or some portion thereof shall not then have been received, Seller shall assign all of its right title and interest in and to any such Proceeds to Purchaser at the Closing or (z) Terminate this Agreement in which case, Purchaser shall be entitled to the return of the entirety of the Escrow Fund which Escrow Agent shall immediately refund to Purchaser, pursuant to Section 2.3. The provisions of this Section shall survive the Closing for a period of six (6) months.

9.3     (a)     Seller and Purchaser hereby waive the provisions of all applicable laws (including General Obligations Law Section 5-1311) relating to the occurrence of a condemnation between the date hereof and the Closing, and Seller and Purchaser agree that the following provisions with respect thereto shall govern. Seller agrees to notify Purchaser promptly, within two (2) business days, if the Premises shall be taken in whole or in party by right of eminent domain or condemnation prior to the Closing (a "**<u>Taking</u>**").

(b)     If a Taking affects a "material portion" of the Premises, Purchaser may, in its sole discretion, may (i) Terminate this Agreement and demand that Escrow Agent refund the Escrow Fund, with interest, to Purchaser in accordance with <u>Section 2.3</u> hereof, or (ii) close title to the Premises and, at the Closing, receive an assignment, without representation, warranty or recourse of any kind, of the right to receive any condemnation award payable to Seller as a result of the Taking. If Purchaser shall elect to Terminate this Agreement pursuant to clause (i) of this

Section 9.3(b), then, in such event, upon Purchaser's receipt of the Escrow Fund with interest, this Agreement shall Terminate automatically and be of no further force or effect and neither party hereto shall have any further rights or obligations hereunder or thereunder without the necessity for any further notice, instrument, document or action by or between any of the parties; *provided, however*, that the terms and provisions of, and indemnities contained in, Section and 14 hereof shall survive any such termination, together with all other indemnities, representations, warranties and obligations which are specifically provided herein to survive any such termination. Unless otherwise provided herein, the term "material portion" shall mean a Taking which affects a portion of the building erected on the Premises and has a value that exceeds Two Hundred Fifty Thousand and 00/100 ($250,000.00) Dollars, as determined in the sole discretion of the Purchaser. If, prior to the Closing, there is a Taking that does not affect a "material portion" of the Premises, Purchaser shall have the right to Terminate this Agreement, but Purchaser in its sole discretion, may purchase the Premises with the Premises in its then condition with an agreed to reduction in the Purchase Price and Seller shall assign to Purchaser the right to receive any condemnation award payable to Seller as a result of the Taking.

9.4     All covenants, agreements, and indemnities of the parties in this Section 9 shall survive the Closing or any termination of this Agreement for a period of six (6) months.

## SECTION 10.  Seller's Closing Obligations.

At the Closing, Seller shall deliver the following items (the "**Transfer Documents**") to Purchaser (with originals of all Transfer Documents required for recording):

(a)     A bargain and sale deed with covenants against grantor acts in the form annexed hereto as Exhibit F, or such deed as is provided by the Bankruptcy Court, containing the covenant required by Lien Law § 13(5), conveying to Purchaser title to the Premises, which deed shall be executed and acknowledged by Seller and Purchaser, in proper statutory form for recording, which Deed shall contain a statement of use as required by Real Property Law Section 339-0(3) confirming commercial use;

(b)     A non-foreign status affidavit in the form annexed hereto and made a part hereof as Exhibit G;

(c)     Intentionally omitted;

(d)     An assignment and assumption of all permits, guaranties and other contractual rights in the form annexed hereto as Exhibit I (the "**General Assignment**");

(e)     A "bring-down" statement from Seller confirming that all representations set forth in Section 6.1 remain true and correct as at Closing;

(f)     Intentionally omitted;

(g)     Intentionally omitted;

(h)     A New York City Real Property Transfer Tax Return and check(s) in payment of any such tax due, *provided, however*, that Seller shall have the right, upon reasonable prior notice to Purchaser, to cause Purchaser to deliver said checks at the Closing and to credit the amount thereof against the balance of the Purchaser Price;

(i)     A New York State Combined Real Estate Transfer Tax Return and check(s) in payment of any such tax due (other than the tax, if any, payable by Purchaser pursuant to <u>Section 11(d)</u> below), *provided, however*, that Seller shall have the right, upon reasonable prior notice to Purchaser, to cause Purchaser to deliver said checks at the Closing and to credit the amount thereof against the balance of the Purchaser Price;

(j)     New York State Real Property Transfer Report;

(k)     To the extent in Seller's possession or control or that of its managing agent, or from such other source as appropriate to provide same to Purchaser, keys to the locks and/or passcodes to entrances to the Premises;

(l)     Such affidavits as the Title Company may reasonably require in order to omit from its title insurance policy, at no additional cost, all exceptions for tenancies and judgments, bankruptcies or other returns against persons or entities whose names are the same as or similar to Seller's name, and such additional documentation in form reasonably required by the Title Company;

(m)     Such other instruments and documents consistent with this Agreement which may be reasonably and customarily required to effectuate the transaction contemplated herein and within Seller's control or possession of that of its managing agent, provided that such instruments or documents may be delivered without additional cost or liability to Seller (other than *de minimis* amounts);

(n)     Copies of all books, records, tenant files, correspondence, legal files and like, both electronic and hard copy, relating to the ownership, operation, management and leasing of the Premises;

(o)     Such evidence or documents as may be reasonably required by Purchaser's Title Company evidencing the status, good standing and capacity of Seller, and the authority of the person or persons who are executing the various documents on behalf of Seller in connection with the sale of the Premises; which shall also include documentation confirming that the sale of the Premises has been approved by the Bankruptcy Court, the Foreclosure has been terminated as against the Premises, and the Lis Pendens extinguished,

the mortgage lien on the Premises extinguished, as well as termination of the Lien Foreclosure and Lis Pendens, and such other documents and writings as may be required by the Title Company to allow Seller to convey of marketable title to Purchaser;

(p)     Intentionally omitted;

(q)     Intentionally omitted;

(r)     Copies of the New York City Department of Finance Real Property Income and Expense Form (Form RPIE) for the Premises which were required to be filed;

(s)     Seller will order and deliver at Closing a reconciliation/title reading from the DEP (and any other requested department or agency) and final meter readings on all meters affecting the Premises dated within two (2) days of the Closing; *provided, however*, that if such reading is not obtained, Seller shall escrow with the Title Company such amount as may be reasonably required as determined by the Title Company to omit any exception for water/sewer charges;

(t)      All approvals, permits, certificates of occupancy and licenses with respect to the Premises, to the extent in Seller's possession or control;

(u)     A Bill of Sale for personal property being conveyed, if any;

(v)     A closing statement/ settlement statement showing the adjustments between the Seller and Purchaser;

(w)     The Common Charge Statement from the Condominium or its managing agent stating that common charges with respect to the Unit due and owing prior to Closing have been paid;

(x)     Proof to be provided of compliance with the Declaration if the Declaration contains a provision requiring prior approval of the sale by the Board of Managers, or a right of first refusal, proof must be submitted to the Title Company that these provisions have been complied with;

(y)     The No-Action Letter from the NYS Department of Law, Real Estate Finance Bureau;

(z)     A certified copy of the Sale Order issued by the Bankruptcy Court;

(aa)     Evidence that each holder of a mortgage lien on the Building (i) has executed and delivered to Seller in escrow all documents and instruments, including those required to be filed in the land records of the City of New York, that

are necessary to release the Property from each such mortgage lien and (ii) has instructed Seller that, upon Purchaser's payment of the Purchase Price, the Supplemental Payments, and such other amounts due and payable by Purchaser under this Agreement at Closing, such documents are to be deemed executed and delivered by such mortgage lien holder and that Seller is authorized to file, or cause the filing of, those documents and instruments required to be filed in the land records of the City of New York or with the Secretary of State of New York to evidence the release of the Property from each such mortgage lien; Alternatively the Bankruptcy Court Order may be provided, subject to Purchaser receiving marketable title at Closing.

(bb)     Seller shall use its best efforts to cause to be delivered to Purchaser and Assignment of Mortgage and Note Allonge; and

(cc)     Certificate of Occupancy for the Premises, as subdivided and reconfigured.

## SECTION 11.  Purchaser's Closing Obligations.

At the Closing, Purchaser shall deliver the following items to Seller:

(a)     The balance of the Purchase Price, as adjusted for apportionments and adjustments under Section 12 hereof;

(b)     Intentionally omitted;

(c)     The General Assignment;

(d)     A New York City Real Property Transfer Tax Return;

(e)     A New York State Combined Real Estate Transfer Tax Return;

(f)     A New York State Real Property Transfer Report;

(g)     Such evidence or documents as may be reasonably required by the Purchaser's Title Company evidencing the status, good standing, and capacity of Purchaser, and the authority of the person or persons who are executing the various documents on behalf of Purchaser in connection with the purchase of the Premises;

(h)     Such other instruments and documents consistent with this Agreement which may be reasonably and customarily required to effectuate the transaction contemplated herein and within Purchaser's control, provided that such instruments or documents may be delivered without additional cost or liability to Purchaser (other than *de minimis* amounts); and

(i)     A power of attorney to the Board of Managers substantially in the form

required by the Declaration or the By-Laws of the Condominium.

**SECTION 12.  Apportionments and Adjustments; Closing Costs.**

12.1    Except as otherwise specifically provided herein, Purchaser and Seller shall adjust as of midnight of the day preceding the Closing the items hereinafter set forth.  If any such items are not determinable at the Closing, the adjustment shall be made subsequent to the Closing when the amount is determined, with any sums required to effectuate the adjustments being made post-closing shall be held in escrow as determined by Purchaser's Title Company.  Any errors or omissions in computing adjustments at the Closing shall be promptly corrected.  The obligations set forth in this <u>Section 12</u> shall survive the Closing for a period of ninety (90) days. Except as otherwise specifically provided for herein, all adjustments shall be made in the manner recommended by the Customs in Respect to Title Closings of the Real Estate Board of New York, Inc., and there shall be no other adjustments.  Subject to the further provisions of this <u>Section 12</u>, the items to be adjusted are:

(a)    Real estate taxes on the basis of the fiscal period for which assessed;

(b)    Utility charges due with respect to the Premises;

(c)    Intentionally omitted;

(d)    Intentionally omitted;

(e)    Water rates, water meter charges, sewer rents, vault charges and other municipal charges, if any, on the basis of the fiscal period for which assessed. If there is a water meter or meters on the Premises, the unfixed meter charges and the unfixed sewer rent thereon shall be apportioned on the basis of the last reading, and shall be appropriately readjusted after the Closing on the basis of the next subsequent bills.  Seller will order and deliver at Closing final meter readings on all meters affecting the Premises dated within two (2) days of the Closing. Seller will pay all open bills at Closing;

(f)    All condominium common charges due and payable with respect to the Unit for the month in which the Closing occurs.  Seller shall be responsible for all condominium common charges due and payable for all months prior to the month in which the Closing occurs and Purchaser shall be responsible for all condominium common charges due and payable for all months after the month in which the Closing occurs;

(g)    The fees and expenses of counsel relating to any proceeding seeking a reduction in real estate taxes for the Premises, with Purchaser being responsible for fees and expenses relating to any reduction which relates to the period commencing on the date of the Closing, unless such representation is to be terminated as of Closing;

(h)    Any other item of cost or expense incurred or payable with respect to the ownership, use or operation of the Premises, apportioned on the basis of documentary evidence of payments made or due for goods, services and obligations therefor, based on documentary basis of payment or incurring of costs or expenses; and

(i)    Any other item which, under the terms of this Agreement, is to be apportioned at the Closing.

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes under clause (a) above at the Closing shall be upon the basis of the old tax rate for the preceding period applied to the latest assessed valuation. Promptly after the new tax rate is fixed, the apportionments of taxes shall be recomputed. Any discrepancy resulting from such recomputation shall be promptly corrected, which obligations shall survive the Closing to until such time as the new tax rate is fixed and for a period of thirty (30) days thereafter to allow any necessary recomputation to be completed and effectuated.

12.2    At the Closing, the net adjustment pursuant to this Section 12 shall be paid (i) if in favor of Seller, in the same manner as set forth in Section 2.2(b) of this Agreement or (ii) if in favor of Purchaser, as a credit against the Purchase Price payable pursuant to Section 2.2(b) of this Agreement.

12.3    Intentionally omitted.

12.4    Intentionally omitted.

12.5    Without limiting any of the provisions of this Section 12, (a) Purchaser shall pay its attorneys' fees and expenses, recording fees and charges, the cost of any title or lien search, any and all premiums of any title insurance and endorsements, and the "mansion tax", if any, and (b) Seller shall pay its attorneys' fees and expenses, and the New York State Real Property Transfer Tax, New York City Real Property Transfer Tax and the New York State Conveyance Tax (other than the "mansion tax") in accordance with Article 31 of the New York State Tax Law, and any other cost or fees necessary to Close and convey marketable title to the Premises to Purchaser.

12.6    Any calculation made in computing any apportionment made pursuant to this Section 12 may be reconfirmed following the Closing, and any errors thereto shall be corrected immediately upon notice from the other party that such error(s) exist. The provisions of this Section 12 shall survive the Closing for one (1) year.

## SECTION 13.  Operation of Premises.

13.1    Subject to the further terms of this Section 13, until the Closing, Seller shall operate the Premises in the same manner that Seller has done so prior to the Effective Date of this Agreement, including but not limited to keeping its current insurance policies covering the Premises in effect through the date of Closing. Seller shall not be required to make any capital

expenditures with respect to the Premises.  If Seller shall make any capital expenditures which (a) are required by law or at the direction of municipal officials, or as a result of an emergency, or (b) are consented to by Purchaser, Seller shall be entitled to a credit for the cost thereof at the Closing.

13.2     Between the September 23,  2022, the date the agreed to "Deal Terms- 350 6th Avenue" were committed to by Purchaser and accepted by Seller through its Broker, and Closing, Seller:

(a)     Has not and shall not convey, encumber, pledge, assign, sell, dispose of, grant or transfer any interest in the Premises except as specifically permitted below; *provided, however,* that same shall not limit or affect any right to transfer interests in Seller (provided Seller shall pay any transfer taxes arising out of transfers of interests in Seller);

(b)     Intentionally omitted;

(c)     Intentionally omitted;

(d)     Has not and shall not permit occupancy of, or enter into any lease for, space in the Premises which is presently vacant or which may hereafter become vacant without the prior written consent of Purchaser;

(e)     Shall request an assignment to Purchaser's lender of Seller's mortgage and shall take such steps as are necessary to cause the assignment of the present mortgage and note allonge to be provided to Purchaser at Closing;

(f)     Shall terminate the employment of all employees of Seller at the Premises; and

(g)     Intentionally omitted.

13.3     Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser.

## SECTION 14.  <u>Broker</u>.

14.1     Each of Seller and Purchaser represents and warrants to the other that it knows of no broker, finder or other person with whom it has dealt or who has claimed or who may have the right to claim any fee, commission or other similar compensation in connection with the transaction contemplated by this Agreement other than Adelaide Polsinelli of Compass ("**<u>Broker</u>**").  Seller shall pay Broker a commission pursuant to separate agreement.

14.2     Purchaser shall Indemnify Seller, its agents, employees and representatives from and against any and all Losses arising out of the breach of Purchaser's representations or

warranties contained in Section 14.1.

14.3    Seller shall Indemnify Purchaser, its agents, employees and representatives from and against any and all Losses arising out of the breach of Seller's representations, warranties and covenants contained in Section 14.1.

14.4    The representations, warranties, covenants and indemnities contained in this Section 14 shall survive the Closing or, if the Closing does not occur, the termination of this Agreement for a period of one (1) year.

**SECTION 15.  Notices.**

15.1    All notices, demands or other communications under this Agreement, including, without limitation, Seller's Demand and Purchaser's Demand, shall be in writing, shall refer to this Agreement and shall be (a) delivered personally, (b) sent by certified mail, postage prepaid, return receipt requested, or (c) sent by a nationally recognized overnight courier, with, in all cases a contemporaneous copy to be sent by electronic mail.  Notices shall be deemed given on the first business day on or after receipt or refusal thereof, which shall include the contemporaneous notice by electronic mail.  All notices shall be given in accordance with the above to the physical and electronic mail addresses for each party as set forth on the first page of this Agreement, with a copy of such notice given as follows:

If the notice is to Seller, the copy to:

James D. Burchetta, Esq.
Burchetta & Associates
125 Park Avenue,17th Fl
New York, New York 10017
Telephone:  917.324.9000
Email:  james@burchettalaw.com

H. Bruce Bronson
Bronson Law Offices PC
480 Mamaroneck Ave.
Harrison, NY 10528
Telephone: 914-269-2530
Email: hbbronson@bronsonlaw.net

If the notice is to Purchaser, the copy to:

Nadine Shadlock, Esq.
Law Office of Nadine F. Shadlock
12 Van Rensselaer Boulevard
Albany, NY 12204
Telephone: 518.281.6977
Email: Nadine@NadineShadlock.com

If the notice is to Escrow Agent:

Bronson Law Offices P.C.
480 Mamaroneck Ave.
Harrison, NY 10528
Attn: H. Bruce Bronson, Esq.
Telephone: 914.269.2530
E-Mail: hbbronson@bronsonlaw.net

15.2    Any counsel designated above or any replacement counsel which may be designated by Purchaser and/or Seller by written notice to the other party is hereby authorized to give notices hereunder on behalf of its respective client.

## SECTION 16.  Limitation on Survival of Representations, Warranties and Obligations.

16.1    Except as expressly set forth herein to the contrary, no representations, warranties or obligations of Seller or Purchaser set forth in this Agreement shall survive the Closing or earlier termination of this Agreement.

16.2    The delivery of the Transfer Documents by Seller and the acceptance thereof by Purchaser and the delivery by Purchaser of the consideration required of Purchaser to Seller hereunder shall be deemed the full performance and discharge of every obligation on the part of such party to be performed hereunder, except those obligations of Seller and Purchaser, respectively, which are expressly stated in this Agreement to survive the Closing.

## SECTION 17.  Prohibition of Recording.

Neither Seller nor Purchaser shall record, or arrange to record, this Agreement or any memorandum thereof with any filing office in any jurisdiction.  Any such recording shall be deemed a material default hereunder by the party recording same, in which case the provisions of Section 5 shall apply.

## SECTION 18.  Miscellaneous.

18.1    Except as provided below in connection with a 1031 tax deferred exchange, Purchaser shall not sell, assign, convey or otherwise transfer all or any portion of its rights or interest under this Agreement without the prior written consent of Seller, which consent shall be granted in the reasonable discretion of Seller. Notwithstanding the foregoing, Purchaser may assign its rights under this Agreement at, and only simultaneous with, the Closing to an entity which Purchaser controls or is controlled by Ira Schwartz, provided that such entity actually closes title to the Premises and Purchaser remains in control of such entity at the time that such entity closes title to the Premises.  Any purported sale, assignment, conveyance or transfer of Purchaser's rights or interest under this Agreement in violation of this Section 18.1 shall be null and void ab initio and shall constitute a material default hereunder.

29

18.2    This Agreement shall be governed solely by, and construed solely in accordance with, the internal laws of the State of New York.

18.3    The captions contained in this Agreement were inserted for convenience of reference only and shall in no way define, describe or limit the scope or intent of this Agreement or any of the provisions hereof.

18.4    This Agreement shall be binding upon, and shall inure to the benefit of, the successors and permitted assigns of the parties hereto.  As used in this Agreement, the neuter includes the masculine and feminine, the singular includes the plural and the plural includes the singular, as the context may require.

18.5    Intentionally omitted.

18.6    If the provisions of any exhibit attached to this Agreement are inconsistent with the provisions of this Agreement, the provisions of such exhibit shall prevail.

18.7    Nothing contained in this Agreement is intended to confer upon any person, other than the parties hereto and their respective successors and permitted assigns, any rights, remedies, obligations or liabilities under, or by reason of, this Agreement.

18.8    The parties acknowledge that each party and its counsel have reviewed and revised this Agreement and that the rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendment, schedule or exhibit hereto. Nothing in this Agreement is intended to or shall create or confer any right, remedy or claim in any person not a party to this Agreement, nor shall any insurer be entitled, by subrogation or otherwise, to rely on, enforce or make a claim based on this Agreement except against its own insured in accordance with the terms of the policy between it and its insured.

18.9    This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument, with the same effect as if each party had executed all counterparts.

18.10   The parties agree that prior to the Closing Date no party nor any affiliate of a party shall, with respect to this Agreement and the transactions contemplated hereby, contact or conduct negotiations with public officials, make any public pronouncements, issue press releases or otherwise furnish information regarding this Agreement or the transactions contemplated hereby to any third party (other than to any lending institution having a lien on the Premises and/or in connection with title searches and/or departmental searches and/or inquires with respect thereto) without the consent of the other party, which consent shall not be unreasonably withheld, delayed or conditioned. Notwithstanding the foregoing, Purchaser shall take such actions and complete such communications, submissions and secure such consents and approvals as are necessary and appropriate, in purchaser's sole discretion, to allow Purchaser to satisfy and conclude the

Contingencies set forth in Section 7, above.

18.11    Notwithstanding any contrary provisions of this Agreement, both parties shall look only to the other party's estate and interest in the Premises for the collection of a judgment (or other judicial process) requiring the payment of money by the other party, and no other property or assets of the other party or any direct or indirect partner, joint venturer, shareholder, member, manager, officer, director, agent or representative or any affiliate thereof, disclosed or undisclosed (collectively, "**Principal**") of the other party, shall be subject to levy, execution or other enforcement procedure for the satisfaction of any judgment against the other party.  Neither party shall name any Principal of the other party as a defendant in any legal action relating to this Agreement.  The provisions of this <u>Section 18.11</u> shall survive the Closing or any termination of this Agreement for a period of one (1) year.

18.12    Submission of drafts of this Agreement for examination or execution by Purchaser shall not bind Seller in any manner or be construed as an offer to sell, and no obligation hereunder shall arise nor shall this Agreement be binding unless and until Escrow Agent receives the Downpayment, this instrument is executed by both Seller and Purchaser, and Seller delivers a fully-executed counterpart of this Agreement to Purchaser or Purchaser's attorney as listed in <u>Section 15.1</u> by (a) personal delivery; (b) certified mail, return receipt requested, postage prepaid; (c) email ; or (d) nationally recognized overnight courier.  The "**<u>Effective Date</u>**" shall be (i) the business day on which such fully-executed counterpart is delivered by hand (or the date that the email to counsel for the respective parties); (ii) the business day following the date sent by overnight delivery; or (iii) the third (3rd) business day following the date sent by certified mail, return receipt requested, postage prepaid.

18.13    The parties hereto agree that no part of the Purchase Price shall be deemed to have been paid by Purchaser for any personal property transferred hereunder.  Sales or use taxes, if any, payable by reason of the sale of any of the personal property shall be the sole responsibility of and shall be paid by Purchaser, and Purchaser shall Indemnify Seller and its Representatives from all Losses relating thereto.  The indemnity set forth in the preceding sentence shall survive Closing for a period of one (1) month.

18.14    This Agreement may not be modified or terminated except (a) pursuant to the terms of this Agreement or (b) by a separate agreement in writing, signed by the party or parties against whom enforcement of such modification or termination is sought.

18.15    Whenever it is provided in this Agreement, including but not limited to the exhibits hereto, that an obligation of one party will be assumed by the other party from and after the Closing, the party so assuming such liability shall Indemnify the other party, its successors and assigns, from all Losses arising from any failure from and after the Closing of the assuming party to perform the obligations so assumed from and after the Closing.  The provisions of this <u>Section 18.15</u> shall survive the Closing or any termination of this Agreement for a period of three (3) months.

18.16    (a)       Seller and Purchaser each reserves the right to include this transaction as part of an IRC, Section 1031 tax deferred exchange for the benefit of such party, at no cost,

expense or liability to the other party. Each party further agrees to execute any and all documents (subject to the reasonable approval of its counsel) as are reasonable necessary in connection therewith, provided that the close of this transaction for the conveyance of the Premises shall not be contingent upon or subject to the completion of such exchange.

(b)     Each party shall be responsible for its costs with respect to any 1031 tax deferred exchange.

18.17. This Agreement may be executed in any number of counterparts, each of which shall be an original with the same force and effect as if the signature thereto were upon the same instrument.  PDF and facsimile signatures shall have the same force and effect as original signatures.

[Balance of this page intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

THIS AGREEMENT SHALL BE DEEMED FULLY EXECUTED UPON EXECUTION BY BOTH PURCHASER AND SELLER, AND SIGNATURE OF ESCROW AGENT, AT WHICH TIME IT MAY BE PRSENTED TO BANKRUPTCY COURT FOR A "SALE ORDER".

**SELLER:**

NUOVO CIAO-DI LLC

Federal Employer Identification
Number# 82-3441535

By: _____
      Name: Michael Raniero
      Title: Managing Member

GREENWICH DEVELOPMENT LLC

**PURCHASER:**

Federal Employer Identification
Number# 93-1393927

By: _____
      Name: Ira Schwartz
      Title: Manager

THE UNDERSIGNED JOINS IN THE EXECUTION HEREOF SOLELY FOR THE PURPOSE OF AGREEING TO ACT AS "ESCROW AGENT" PURSUANT TO THE PROVISIONS OF THIS AGREEMENT RELATING TO THE ESCROW FUND.

ESCROW AGENT:
BRONSON LAW OFFICES P.C.

Title: Attorney

33

# EXHIBIT A

## THE PREMISES

### SCHEDULE A (Description)

Title Number:  **LAA5951**

The Condominium Units known as Commercial Unit No. 1 and 2 (the Units) in the premises known as 88 Washington Place Condominium, said Units being designated and described as Units Nos. 1 and 2 in the Declaration made by Ciao-Di Restaurant Corporation, pursuant to Article 9-B of the Real Property Law of The State of New York (the Condominium Act) establishing a plan for condominium ownership of said premises, which Declaration was recorded in the Office of the Register of the County of New York on 3/9/2007 in CRFN 2007000128061, and said unit being also designated as Tax Lots No. 1301 and 1302 in Block 552 on the tax map of The City of New York for the Borough of New York in the Real Property Assessment Department of The City of New York and on the Floor Plans of the building (the Building) in which the Unit is contained, and filed with the Real Property Assessment Department of the City of New York on 3/9/2007, as Condominium Plan No. 1660 and also filed in the said Register's Office on 3/9/2007, as Map in CRFN 2007000128062.

TOGETHER with a 19.65% and 21.25%, respectively, undivided interest in the common elements.

The land on which said Building is located is bounded and described as follows:

BEGINNING at the corner formed by the intersection of the southerly side of Washington Place and the easterly side of Avenue of the Americas;

RUNNING THENCE southerly 131 feet and 11- 7/8 inches to a point distant 61 feet northerly from the corner formed by the intersection of the northerly side of West 4th Street and the easterly side of Avenue of the Americas;

THENCE easterly at right angles to Avenue of the Americas, 67 feet and 2- 3/8 inches;

THENCE northerly, along a line which on its westerly side makes an angle of 93 degrees 32 minutes 38 seconds with the last mentioned course, 6 feet and 9 inches;

THENCE easterly, along a line which on its southerly side makes an angle of 89 degrees 36 minutes 43 seconds with the last mentioned course, 3.31 feet;

THENCE northerly, along a line at right angles to Washington Place, 120 feet and 4 and 1/4 inches to a point on the southerly side of Washington Place, distant 79 feet and 4 inches from the corner formed by the intersection of the southerly side of Washington Place and the easterly side of Avenue of the Americas;

THENCE westerly, along said southerly side of Washington Place, 79 feet and 4 inches to the point or Place of BEGINNING.

FOR INFORMATION ONLY:
Property Address:  88 West Washington Place, Units 1301 and 1302, New York, NY
Block: 552      Lots: 1301-1302

## Exhibit A

## "Premises"

Diagram of Unit 1 Area to be Subdivided and Conveyed to Purchaser together with Unit 2.



6TH AVENUE

EXISTING
ELEV

NEW
ENTRANCE

EXISTING
PIPE

EXISTING
STAIR

PIPE

2,853 SF

FLOOR 1 "SUBDIVIDED UNIT"

DN

9'-0"
SPRINKLER
HEAD
11'-4"
SPRINKLER
PIPE
11'-2"
DUCT
14'-5"
B.O.SLAB
13'-6"
B.O.BEAM

B

MTA EASEMENT

FUTURE MTA EASEMENT

BASEBOARD
HEATER

WASHINGTON PLACE

DN

EXISTING
STAIR
UP

EMERGENCY
EXIT
ACCESS

EXISTING
ELEV

EXISTING
ELEV

EXHIBIT A-1

EXHIBIT A-2

Example of NY Attorney General No-Action Letter

TO BE PROVIDED

## EXHIBIT B

## Permitted Exceptions

## NONE

.

EXHIBIT C

Leases

NONE

EXHIBIT D

Lease Defaults and Delinquencies

NOT APPLICABLE

EXHIBIT E

Service Contracts


TO BE IDENTIFIED AND ATTACHED.

EXHIBIT F

Form of Deed


TO BE ATTACHED

## Non-Foreign Status Affidavit

Section 1445 of the Internal Revenue Code provides that a transferee of a United States ("U.S.") real property interest must withhold tax if the transferor is a foreign person. To inform the transferee that withholding of tax is not required upon the disposition of a U.S. real property interest by _____, the undersigned hereby certifies the following on behalf of _____:

1____ is not a foreign corporation, foreign partnership, foreign trust or other foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2    -_____U.S. employer identification number is _____ _____; and

3    _____office address is _____ _____.

The undersigned understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment or both.

Under penalties of perjury, I declare that I have examined this certification and to the best of my knowledge and belief it is true, correct and complete, and I further declare that I have the authority to sign this document on behalf of _____.

Dated: _____, 2022

By: _____

Name: _____

Title: _____

EXHIBIT H

Assignment and Assumption of Leases

NOT APPLICABLE

<u>EXHIBIT I</u>

<u>General Assignment</u>

_____, ("**ASSIGNOR**"), having an address_____, pursuant to the terms of that certain Contract of Sale dated February ____, 2023, and in consideration of the premises and the mutual agreements, promises, and covenants contained herein and other good and valuable consideration paid by and _____("**ASSIGNEE**"), having an address at _____ _____, hereby assigns, transfers and conveys unto ASSIGNEE, without representation, warranty or recourse of any kind, all of ASSIGNOR's right, title, interest and obligations, to the extent such are assignable, in, to, and under the contracts, permits and other rights set forth in <u>Schedule A</u> attached hereto and made a part hereof (the "**Assigned Rights**").

This assignment shall be governed by the laws of the State of New York.

This instrument may be executed in counterparts, all of which shall constitute one instrument, binding on all the parties hereto, notwithstanding that all the parties are not signatories to the original or the same counterpart.

This assignment is made without any representations or warranties by ASSIGNOR to ASSIGNEE.

IN WITNESS WHEREOF, ASSIGNOR has executed this instrument as of the ___ day of _____, 20_.

**ASSIGNOR**

                    _____

By:    _____

         By: _____

              Name: _____

              Title: _____

**ASSIGNEE**:        **[PURCHASER]**

                   By: _____

                   Name: _____

                     Title: _____

<u>EXHIBIT J</u>

TENANT ESTOPPEL CERTIFICATE

<u>NOT APPLICABLE</u>